# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF TEXAS
# MARSHALL DIVISION

| | |
|---|---|
| PHENIX LONGHORN LLC, | § |
| *Plaintiff,* | § § |
| v. | § § |
| AU OPTRONICS CORPORATION, HISENSE ELECTRONICA MEXICO, S.A. DE C.V., HISENSE USA CORPORATION, HISENSE VISUAL TECHNOLOGY CO., LTD., *and* DOES 1–10, | § § § § § § § CASE NO. 2:23-CV-00477-RWS-RSP |
| *Defendants.* | § § § |

## MEMORANDUM ORDER

Before the Court is Defendants' Motion to Exclude Opinions of Justin R. Blok. **Dkt. No. 251**. The Motion is fully briefed. *See* Dkt. Nos. 294, 335, 340. In the Motion, Defendants seek to exclude portions of Plaintiff's damages expert's opinions because he allegedly (1) bases his opinions on a litigation settlement license without understanding how it was calculated, and without apportioning out the value of six other included patents, (2) uses market data to estimate importation but fails to account for sales from products of manufacturers other than AUO, (3) parrots facts he learned through hearsay, and (4) relied on a late produced report. *See* Dkt. No. 251 at 1. For the reasons set forth below, the Motion is **DENIED**.

## I.     LEGAL STANDARD

An expert witness may provide opinion testimony if "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702.

Rule 702 requires trial courts to make a preliminary determination, when requested, as to whether the requirements of the rule are satisfied regarding a particular expert's proposed testimony. *See Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 149 (1999); *Daubert*, 509 U.S. at 592–93 (1993). Such courts are given broad discretion in making Rule 702 admissibility determinations. *Kumho Tire*, 526 U.S. at 152 ("[A] judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert's testimony is reliable"). Although the Fifth Circuit and other courts have identified various factors that the court may consider in determining whether an expert's testimony should be admitted, the nature of the factors that are appropriate for the court to consider is dictated by the ultimate inquiry—whether the expert's testimony is sufficiently reliable and relevant to be helpful to the finder of fact and thus to warrant admission at trial. *See United States v. Valencia*, 600 F.3d 389, 424 (5th Cir. 2010).

Importantly, in a jury trial setting, the Court's role under *Daubert* is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role; instead, the Court's role is limited to that of a gatekeeper, ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue before the jury that it is appropriate for the jury to consider. *See Micro Chem., Inc. v. Lextron, Inc.*, 317 F.3d 1387, 1391–92 (Fed. Cir. 2003) (applying Fifth Circuit law) ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one expert's testimony."); *Pipitone v. Biomatrix, Inc.*, 288 F.3d 239, 249–50 (5th Cir. 2002) ("'The trial court's role as gatekeeper [under *Daubert*] is not intended to serve as a replacement for the adversary system.' . . . Thus, while exercising its role as a gate-keeper, a trial court must take care not to transform a *Daubert* hearing into a trial on the merits" (quoting an Advisory Committee Note to Fed. R. Evid. 702)). As the Supreme Court explained, "[v]igorous cross-examination, presentation of contrary evidence, and careful

instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *See Mathis v. Exxon Corp.*, 302 F.3d 448, 461 (5th Cir. 2002).

Despite the above, however, "even if testimony is reliable, it may still be excluded if it relies on information that violates the [Federal] [R]ules [of Civil Procedure]." *Estech Sys. IP, LLC v. Carvana LLC*, No. 2:21-CV-00482, 2023 WL 3292881, at *2 (E.D. Tex. May 5, 2023).

## II.   DISCUSSION

As noted in the introduction, Defendants advance several theories for excluding portions of Mr. Blok's opinions. *See* Dkt. No. 251 at 3–15. The Court addresses each in turn.

A.   Mr. Blok's Opinions Based on the Innolux Agreement

The Innolux Agreement is a licensing agreement that resulted from a settlement of a prior litigation between Plaintiff and Innolux. *See* Dkt. No. 251-6 at 1; Dkt. No. 251-2 ¶ 85. The consideration recited in the agreement is $3.825 million, *see* Dkt. No. 251-6 ¶ 2.1; Dkt. No. 251-2 ¶ 87, and was "calculate[ed]" based, *inter alia*, on the fact that "Innolux sold 2,780,623 products relevant to Phenix's claims of infringement of the Asserted Patents" in the Innolux case during the damages period, *see* Dkt. No. 251-6 ¶ 2.2; Dkt. No. 251-2 ¶ 87. The "Settlement Payment was negotiated in an arms' length discussion based on [that fact]." *See id.* It also included a "Covenant Not To Sue" Innolux for the "Released Products." *See* Dkt. No. 251-6 ¶ 2.4.

While the only asserted patents in that action were the same patents asserted here—U.S. Patent Nos. 7,233,305 ("'305 Patent") and 7,557,788 ("'788 Patent")—the license was to "Released Patents," encompassing "all active and expired U.S. and foreign patents and patent applications owned by [Plaintiff] as of the Effective Date of the Agreement, including the Asserted Patents . . . including but not limited to those set forth in Exhibit A." *See id.* at 1; *id.* ¶¶ 1.7, 2.4, 6.1. Exhibit A listed eight total patents, including the two asserted patents (the '305 and '788 Patents), as well as U.S. Patent Nos. (1) 6,693,828, (2) 8,188,952, (3) 7,554,843, (4) 8,194,015,

3

(5) 6,985,372, and (6) 7,061,380. *See id.* at 12. Notably, the effective date of the agreement is the date of execution, September 26, 2025. *See id.* at 11. Three of those six additional released patents expired in 2023; only patents (2), (3), and (4) had remaining life at that time. *See* Dkt. No. 251-2 ¶ 90. Both Parties agree that Mr. Blok relied on the Innolux Agreement in his calculation of the reasonable royalty. *See* Dkt. No. 294 at 2; Dkt. No. 251 at 3–5.

Defendants first argue that Mr. Blok's use of the Innolux Agreement is unreliable because he allegedly compares the 2.78 million units (products) figure from that agreement with the 3.5 to 4.5 million units[1] figure accused in this case to adjust the $3.825 million settlement payment from that agreement upward in his calculation of the reasonable royalty in this case. *See* Dkt. No. 251 at 3, 5–9. Defendants argue that "it makes a difference" what those products were, and points to Mr. Blok's deposition testimony for support that he did not know "how that number was derived." *See id.* at 6, 6 n.4 (citing, *e.g.*, Dkt. No. 251-5 at 115:22–116:2). Defendants also appear to argue, in part, that the agreement itself is unreliable because it is a "litigation-driven settlement." *See id.* at 5. Defendants finally argue that Mr. Blok's attribution of the entire settlement payment to the two patents asserted here (the '305 and '788 Patents) is unreliable because he "failed to apportion any value for the other six patents." *See id.* at 9–10.

Defendants make heavy use of the recent Federal Circuit case, *EcoFactor, Inc. v. Google LLC*, 137 F.4th 1333 (Fed. Cir. 2025) (*en banc*), to argue by analogy that Mr. Blok's use of the 2.78 million units (products) figure from the Innolux Agreement is unreliable because the evidence around the agreement itself "cannot reasonably support competing conclusions." *See* Dkt. No. 251 at 6–7 (citing *EcoFactor*, 137 F.4th at 1346). But the analogy is weak. Specifically, in *EcoFactor*,

---

[1] Plaintiff entered into a settlement agreement with iML for the '305 Patent, and AUO sells LCD panels incorporating some of iML's Pgamma ICs. *See* Dkt. No. 251 at 2 n.2. The 3.5-million-units number is without iML Pgamma ICs, while the 4.5-million-units number is with those ICs. *See id.*

4

one of the relied-upon licenses stated that the "amount is not based upon sales and does not reflect or constitute a royalty," *see* 137 F.4th at 1333, and another stated that the payment is "based on what [plaintiff] believes is a reasonable royalty," without defendant conceding that it was in fact a reasonable royalty, as well as another similar statement to the first license, *see id.* at 1342, and the final relied-upon license contained "substantially the same recital," *see id.* at 1343. The Federal Circuit therefore explained that "the plain language of the license agreements does not support [plaintiff's damages expert]'s testimony that [the licensees] agreed to pay the" asserted royalty rate, which was asserted as a fact without qualification by that plaintiff's damages expert. *See id.* at 1343.

But the Innolux Agreement contains no such qualification or recital, as Plaintiff points out. *See* Dkt. No. 294 at 6–7. Instead, as indicated earlier, it states in full the following:

> **2.1 Payment**. As consideration for the releases and covenants granted herein . . . Innolux will pay to Phenix the total sum of $3,825,000 U.S. Dollars ($) (the "Settlement Payment") . . . .
>
> **2.2 Calculation of Settlement Paymen**t. From October 10, 2017 through June 15, 2025, Innolux sold 2,780,623 products relevant to Phenix's claims of infringement of the Asserted Patents. Based on the amount of the Settlement Payment and the total number of relevant products, the effective royalty rate paid is $1.375 per unit. The Parties acknowledge and agree that the amount of the Settlement Payment was negotiated in an arms' length discussion based on the total number of relevant products that Innolux sold.

Dkt. No. 251-6 ¶¶ 2.1–.2 (emphasis in original). While Defendants do not dispute that this was a deciding point of *EcoFactor*, they pivot to arguing that Mr. Blok's reasonable royalty calculation based on the Innolux Agreement "suffers from the same fundamental flaw" as the licenses in *EcoFactor* because "the licensees' agreement to the rate was untethered from the license and unsupported by the evidence." *See* Dkt. No. 335 at 1.

The Court disagrees. In *EcoFactor*, "the only evidence" other than the language of the licenses themselves upon which plaintiff's damages expert relied was the testimony of plaintiff's

5

CEO, *see* 137 F.4th at 1343, and it contradicted the language of the agreements, *see id.* at 1343–44 (*e.g.*, "Mr Habib testified that the lump-sum payments for each of the three licenses was calculated by multiplying the licensee's past and future projected sales by the … per unit rate."). Thus, the Federal Circuit found that "a fundamental premise of [plaintiff's damages expert]'s testimony—that [the licensees] agreed to pay the rate—was not based on sufficient facts or data," *see id.* at 1345. While Defendants may be correct that Mr. Domengeaux, Plaintiff's representative, admitted he doesn't "know which products are among the 2.78 million," the fact of the matter is that the Innolux License here does state that it is based on those sales, unlike in *EcoFactor*. And despite Defendants' contention that his "extent of use" adjustment was lacking, *see* Dkt. No. 335 at 1–3, having reviewed the briefing and Mr. Blok's reports, the Court finds that his acknowledgement of the figure and the bases for it are sufficiently reliable.

Defendants' other arguments here are likewise unpersuasive. To Defendants' second argument, licenses resulting from litigation may be used in a damages expert's calculation of a reasonable royalty so long as, *inter alia*, they are sufficiently comparable (technically and economically). *See, e.g.*, *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872–73 (Fed. Cir. 2010); *Prism Techs. LLC v. Sprint Spectrum L.P.*, 849 F.3d 1360, 1369–72 (Fed. Cir. 2017); *Laser Dynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 77 (Fed. Cir. 2012) (holding that settlement licenses may be considered in "proper context within the hypothetical negotiation framework").

To Defendants' final argument, the Innolux Agreement itself acknowledges that it resulted from a settlement of a litigation involving only the same two patents asserted here—the '788 and '305 Patents. *See* Dkt. No. 251-6 at 1. Although it also includes licenses to other non-asserted patents that Plaintiff owned at that time, three of those patents were expired, and the other three were, of course, not involved. Moreover, Mr. Blok acknowledges all of this in his analysis, and

6

states that he has accounted for these facts. *See* Dkt. No. 251-2 ¶¶ 85–91. Even if his accounting for these additional patents is zero, as Defendants complain, *see* Dkt. No. 251 at 10; Dkt. No. 335 at 3–4, Defendants have not met their burden of showing that this accounting alone is insufficiently reliable such that Mr. Blok's opinions should be excluded.

Accordingly, the Court finds that Defendants' Motion should be and hereby is **DENIED** in seeking to exclude Mr. Blok's use of the Innolux Agreement in his calculation of a reasonable royalty.

B.  Mr. Blok's Importation Opinions Relying on Market Data Research

Defendants next argue that Mr. Blok's failure "to apportion his market research data to account for customer U.S. sales that use AUO products versus other" manufacturers' products renders his importation opinions unreliable. *See* Dkt. No. 251 at 10–13. Specifically, Defendants take issue with Mr. Blok's method of estimating the importation rate of accused AUO products into the United States through AUO's customers, wherein he relies on third party market research firms' estimates of market share related to the customers' products generally, as reported in the Grand View Report and the Statista TV Market Report. *See id.* Defendants argue this method of estimating importation is unreliable because it is "not specific to AUO" and "include[s] televisions containing components from suppliers other than AUO." *See id.* at 12–13.

Having considered these arguments and reviewed Mr. Blok's report, the Court finds that his analysis estimating what percentage of AUO's allegedly infringing products are imported into the United States to be sufficiently reliable. He is not using the market share estimates (or revenues) as a base for apportionment generally. *See Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1320–21 (Fed. Cir. 2011) (clarifying *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1338–39 (Fed. Cir. 2009)); *Roland Corp. v. inMusic Brands, Inc.*, No. 2023-1327, 2025 WL

7

926703, at *15 (Fed. Cir. Mar. 27, 2025). Instead, he only uses them to estimate importation rates for each customer of AUO.

Although Defendants take issue with the fact that Mr. Blok "admits that the reports notify users that they are provided on a best effort basis and are subject to data availability," *see* Dkt. No. 251 at 12 n.7 (citing Dkt. No. 251-5 at 149:2–24), and that he "would have preferred the customers' actual sales data [to the market research reports]," *see id.* at 12 (citing Dkt. No. 251-4 at 57:21–58:3), the Court finds these disclaimers to be indicia of reliability—he explicitly discloses the limitations of his importation estimate. Moreover, as Plaintiff points out, Mr. Blok "narrow[ed] his inquiry to the LCD TVs that incorporate the accused products and customers that purchased accused products from AUO and sold LCD TVs into the United States." *See* Dkt. No. 294 at 11 (citing Dkt. No. 251-2 ¶¶ 143–53). Crucially, Defendants have pointed to no other better evidence of volume of products sold in the United States that Mr. Blok could have more properly relied upon.

Accordingly, the Court finds that Defendants' Motion should be and hereby is **DENIED** in attempting to exclude Mr. Blok's reliance on the Grand View and the Statista TV Market Reports to estimate AUO's customers' importation of allegedly infringing products into the United States.

C. Mr. Blok's Reliance on Hearsay

Defendants next argue that Mr. Blok "has no personal knowledge of the facts concerning Alta's discussion with AUO in the early 2000s or the financial position of Alta at or around the time of the hypothetical negotiation in 2011," and therefore cannot establish these facts without his reliance on "conversations with Mr. Orlando and his reading of unauthenticated [and] hearsay documents." *See* Dkt. No. 251 at 13. However, Defendants concede that Mr. Blok "may be able to

8

base his opinions on these facts if already introduced in evidence at trial," and "experts may rely on hearsay to form their opinions." *See id.*

Defendants Motion is **DENIED** to the extent it seeks to exclude Mr. Blok's reliance on hearsay and unauthenticated evidence related to Alta's discussion with AUO in the early 2000s and the financial position of Alta at or around the time of the hypothetical negotiation.

D.  Mr. Blok's Use of the Untimely RosettiStarr Report

The arguments made here for excluding Mr. Blok's use of the allegedly untimely RosettiStar report to support new damages theories are identical to Defendants' Response in Opposition, Dkt. No. 278, to Plaintiff's Motion for Leave to Supplement the Opening Damages Report of Justin Blok, Dkt. No. 236. However, Plaintiff's Motion for Leave is co-pending and has not yet been granted, making the arguments Defendants made here premature. Accordingly, and for judicial efficiency and clarity, Defendants' Motion is **DENIED** to the extent it seeks to exclude Mr. Blok's use of the RosettiStarr Report. However, the Court carries the arguments made here for exclusion to be addressed in its forthcoming order on Plaintiff's co-pending motion.

### III.   CONCLUSION

For the reasons and to the extent provided above, Defendants' Motion to Exclude Opinions of Justin R. Blok is **DENIED**.

**SIGNED this 13th day of January, 2026.**

_____
ROY S. PAYNE
UNITED STATES MAGISTRATE JUDGE